AO 93C  (Rev. 8/18) Warrant by Telephone or Other Reliable Electronic Means (USAO rev. 12/20)          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>The person of Kenneth Dye, with the date of birth of<br>November 14, 1967 | )<br>)<br>)<br>)<br>)<br>)    Case No. 8:21-MJ-00361-DUTY |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

Date and time issued:  <u>May 26, 2021 at 2:19 p.m.</u>

City and state:  <u>Santa Ana, CA</u>

*Judge's signature*

<u>Honorable John D. Early, U.S. Magistrate Judge</u>
*Printed name and title*

AUSA:  <u>D. Ahn (x3539)</u>

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>8:21-MJ-00361-DUTY | Date and time warrant executed:<br>5/27/21   1430 | Copy of warrant and inventory left with:<br>Kenneth Dye |
| Inventory made in the presence of :<br>SA Monica ABend | | |
| Inventory of the property taken and name of any person(s) seized:<br><br>No Items Seized | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:   6/24/2021

_____
*Executing officer's signature*

Kevin leDuc   Special Agent
*Printed name and title*

## **ATTACHMENT A-2**

<u>PERSON TO BE SEARCHED</u>

The person to be searched is Kenneth Dye, with the date of birth of November 14, 1967.



**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography), namely:

a.  Child pornography, as defined in 18 U.S.C. § 2256(8)(A) and (C).

b.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8)(A) and (C), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or documents that refer to a transaction of any kind involving child pornography.

c.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or involved in a

transaction of any kind involving child pornography, as defined in 18 U.S.C. § 2256(8)(A) and (C).

      d.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      e.  Any and all records, documents, programs, applications, materials, or items that are sexually arousing to individuals who are interested in minors, but that are not in and of themselves obscene or that do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques relating to child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

      f.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

      g.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of 555 S. La Veta Park

Cir., Unit 211, Orange, California 92868 (the "SUBJECT PREMISES").

h.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

i.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vii

vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

viii.   records of or information about
Internet Protocol addresses used by the device;

ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic

image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized,

the team shall immediately discontinue its search of that device
pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

d.    If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

f.    If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.    The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

     5.   This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress Kenneth Dye's ("Dye")
thumb and/or fingers onto the fingerprint sensor of the device
(only when the device has such a sensor), and direct which

specific finger(s) and/or thumb(s) shall be depressed; and (2)
hold the device in front of Dye's face with his or her eyes open
to activate the facial-, iris-, or retina-recognition feature,
in order to gain access to the contents of any such device.  In
depressing a person's thumb or finger onto a device and in
holding a device in front of a person's face, law enforcement
may not use excessive force, as defined in Graham v. Connor, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

    8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

## AFFIDAVIT

I, Kevin Leduc, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to HSI Orange County, California.  In 2014 I was hired as a Computer Forensic Analyst.  In 2017, I attended the Criminal Investigators Training Program located at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have participated in and/or received training in numerous investigations of criminal activity, including, but not limited to, the investigation of narcotics offenses, money laundering, fraud, child pornography, alien smuggling and human trafficking. During investigation of these matters, I have participated in the execution of search warrants.

2.    I investigate, among other things, the sexual exploitation of children and child pornography in the Central District of California as part of the Orange County Child Exploitation Task Force ("OCCETF").  The OCCETF is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2252, et seq.  As part of these investigations, I have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media.  Moreover, I am a federal law enforcement

officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

## II.  PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of an application for a warrant to search:

a.   The premises located at 555 S. La Veta Park Cir., Unit 211, Orange, California 92868 (the "SUBJECT PREMISES"), more fully described below and in Attachment A-1;

b.   The person of Kenneth Dye, with the date of birth of November 14, 1967, more fully described below and in Attachment A-2;

c.   A 2012 white Mazda 3i, bearing CA license plate 7LIS321, more fully described below and in Attachment A-3; and

d.   A 2010 silver Toyota, bearing CA license plate 6YEX696, more fully described below and in Attachment A-4, and to seize evidence, fruits, and instrumentalities of criminal conduct, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography) (collectively, the "Subject Offenses").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does

2

not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  **DEFINITIONS**

5.  The following definitions apply to this affidavit and Attachment B:

a.   The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined in 18 U.S.C. § 2256.

b.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

c.   The term "computer" is defined in 18 U.S.C. § 1030(e)(1).

d.   "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including

keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

f.   The term "Internet" is defined as the worldwide network of computers — a noncommercial, self-governing network devoted mostly to communication and research with roughly 3.2 billion users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university,

employer, or commercial Internet Service Provider ("ISP"), which
operates a host computer with direct access to the Internet.

g.   The term "Internet Protocol" ("IP") is defined as
the primary protocol upon which the Internet is based.  IP
allows a packet of information to travel through multiple
networks (groups of linked computers) on the way to its ultimate
destination.

h.   The term "IP address" is defined as a unique
number assigned to each computer directly connected to the
Internet (for example, 74.100.66.74).  Each computer connected
to the Internet is assigned a unique IP address while it is
connected.  The IP address for a user may be relatively static,
meaning it is assigned to the same subscriber for long periods
of time, or dynamic, meaning that the IP address is only
assigned for the duration of that online session.

i.   The term "Internet Service Provider" ("ISP") is
defined as a business that allows a user to dial into or link
through its computers, thereby allowing the user to connect to
the Internet for a fee.  ISPs generally provide only an Internet
connection, an electronic mail address, and maybe Internet
browsing software.  A user can also connect to the Internet
through a commercial online service such as AT&T, Verizon, or
Time Warner Cable.  With this kind of connection, the user gets
Internet access and the proprietary features offered by the
online service, such as chat rooms and searchable databases.

j.   A "hash value" is a unique alpha-numeric
identifier for a digital file.  A hash value is generated by a

mathematical algorithm, based on the file's content.  A hash value is a file's "digital fingerprint" or "digital DNA."  Two files having identical content will have the same hash value, even if the file names are different.  On the other hand, any change to the data in a file, however slight, will change the file's hash value, even if the file name is unchanged.  Thus, if two files have the same hash value, they are said to be identical, even if they have different file names.

k.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

l.    A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

m.    A "website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP").

n.    "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  IP addresses can be "dynamic," meaning that the Internet service provider assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an

6

Internet service provider assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

## IV. <u>PROBABLE CAUSE</u>

**A.     Background on NCMEC, the CyberTipline, and Yahoo**

6.     The National Center for Missing & Exploited Children ("NCMEC") is the leading non-profit organization in the U.S. working with law enforcement, families, and the professionals who serve them on issues related to missing and sexually exploited children.  NCMEC has established a missing child hotline and serves as the national clearinghouse for information related to these issues.

7.     NCMEC operates a CyberTipline to provide electronic service providers an effective means of reporting Internet-related child sexual exploitation, including possession, manufacture, and distribution of child pornography.  <u>42 U.S.C. § 5773(b)(1)(P)</u>.  Any electronic service provider that discovers what appears to be child pornography must report that fact and its surrounding circumstances to the CyberTipline.  <u>18 U.S.C. § 2258A(a)</u>.  <u>See also</u> <u>United States v. Keith</u>, <u>980 F. Supp. 2d 33, 39</u> (D. Mass. 2013).  NCMEC forwards information received from electronic service providers via the CyberTipline to an appropriate federal or state law enforcement agency.  <u>18 U.S.C. § 2258A(c)</u>.

8.     Yahoo! Inc. ("Yahoo") is an American web services provider owned by Verizon Media.  It currently provides services such as a web portal, a search engine known as Yahoo search, and

an email service known as Yahoo email.  Furthermore, Verizon Media merged Yahoo into a subsidiary named Oath Holdings Inc. This case involves a Yahoo user who was reported by Yahoo.

**B.    The CyberTipline Reports**

9.    This investigation began in or around March through April of 2021, when Yahoo submitted CyberTipline Reports 88285071 and 88955441 to the NCMEC CyberTipline.  The CyberTipline Report 88285071 included thirteen images of Child Sexual Abuse Material ("CSAM"), seven of which appeared to be CSAM.  The CyberTipline Report 88955441 was a supplemental report from Yahoo saying the user appears to be an individual named Kenneth Don Dye, and that he may work as a police officer at the Los Angeles Police Department.  CyberTipline Report 88285071 provided the following account information:

```
Name: Don Smith
Address: 90019 US
Address: US
Mobile Phone: +16266225082 (Verified 07-12-2020
09:28:28 UTC)
Date of Birth: 11-01-1967
Email Address: don196769@yahoo.com
ESP User ID/Yahoo GUID: RLL2DZLOA4KAZK4FTEFU4AOUEU
```

10.    Yahoo reported multiple emails between the above-referenced user and other users where CSAM images were distributed and received.  Yahoo provided email accounts as well as file names sent and received through Yahoo user don196769@yahoo.com.  The dates of these emails range from May 4, 2015 through March 30, 2021.

11.   Yahoo also reported that while the name on the account was "Don Smith," other information associated with the account related to Kenneth Don Dye.  For example, Yahoo noted that the account had two alternate email addresses: kdye1114@yahoo.com and kendye1967@yahoo.com.  In addition, Yahoo had reviewed images in the user's Yahoo Mail which depicted an adult male. Comparing those images to images in a Facebook profile of "Kenneth Dye" depicting the same adult male led Yahoo to state that the adult male appears to be the user, Dye.  Yahoo noted that the "About" section of the Facebook account indicated that Dye was a police officer in Los Angeles.

12.   In the above-listed CyberTipline Reports, moreover, Yahoo reported that they had viewed the entire contents of each of the files prior to the submission of the tips to NCMEC.

**C.   Review of Files**

13.   On May 20, 2021, HSI Orange County received the NCMEC CyberTipline reports.  I viewed all the files attached to the CyberTipline Report and saw that seven depicted what appeared to be CSAM.  Described below are three of the image files included in CyberTipline Report 88285071:

a.   The reported image file titled "5" depicts a nude female child, approximately six to eight years of age, only wearing pink thigh-high socks.  She is lying on her back with her knees bent up and her legs spread apart, exposing her vagina.  Her left ankle and left thigh are tied together by a gold rope.  The same gold rope travels behind the child's neck and down to her right thigh and ankle, which are also bound

9

together by the rope.  A nude adult is keeling by her face with his erect penis in her mouth.

b.    The reported image file titled "255112032_1" depicts a nude female child, approximately five to seven years of age, lying on her back with her knees bent up into her chest. The child's legs are spread apart fully exposing her vagina and her anus as she is urinating.

c.    The reported image file titled "6" depicts a naked girl approximately five to seven years of age lying on her back with her legs spread exposing her vagina.  Multiple cherries are placed on and around her including one between her vagina lips.

**D.    Identification of the SUBJECT PREMISES**

14.  On or about April 27, 2021, Los Angeles Police Department ("LAPD") submitted search warrants to Charter Communications Incorporated ("Charter"), Verizon Wireless ("Verizon"), and Cox Communications, Inc. ("COX") for subscriber and account information and received the following:

a.    Charter IP address 172.90.116.53, which was provided by Yahoo, returned to Lenore Mallek-Passey at the SUBJECT PREMISES.  Passey is believed to be the roommate of Dye, based on the fact that, per law enforcement surveillance (as noted below), Dye appears to be staying at the SUBJECT PREMISES. According to Charter, the above IP address has been leased to the SUBJECT PREMISES since May 18, 2020.

b.    Charter IP address 45.48.97.168, which was also provided by Yahoo, returned to LAPD's Wilshire Division.  Based

on information from LAPD, I know that Dye is currently stationed
and works at the LAPD Wilshire Division, and has worked there
since in or around May 2003.  According to Charter, the above IP
address has been leased to LAPD's Wilshire Division since
October 16, 2019, covering Dye's employment with LAPD.

15.  On or about May 12, 2021 through May 15, 2021,
surveillance was conducted by LAPD on Dye, who was followed to
the SUBJECT PREMISES.  LAPD confirmed Dye by his photograph
provided by the California Department of Motor Vehicles, as well
as his vehicle registration.  LAPD observed two vehicles
registered to Passey and Dye parked at the apartment complex
(i.e., the SUBJECT PREMISES): a 2012 Mazda bearing CA license
plate 7LIS321, and 2010 Toyota bearing CA license plate 6YEX696.
LAPD confirmed the vehicles by witnessing Dye driving the Mazda
to and from work, and determining that the Toyota is registered
to both Passey and Dye.

**E.   Characteristics Common to Individuals Who Receive, Possess, or Access with Intent to View Child Pornography**

16.  Based on my previous investigative experience related
to child exploitation investigations, and the training and
experience of other law enforcement officers with whom I have
had discussions, I know there are certain characteristics common
to individuals who distribute, receive, possess, and/or access
with intent to view child pornography:

a.  Individuals who have a sexual interest in children
or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children or from

fantasies they may have from viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.

b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children sometimes possess and maintain "hard copies" of child pornographic material – that is, pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. When they do, they generally possess these materials in the privacy and security of their home or some other secure location. When individuals who have a sexual interest in children or images of children collect pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes, they often retain these materials for many years.

d.  Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

e.  Individuals who have a sexual interest in children or images of children may correspond with and/or meet others to share information and materials; often retain correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do with their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact with and who share the same interests in child pornography.

f.  Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

**V.  TRAINING AND EXPERIENCE RELATING TO CHILD PORNOGRAPHY AND PERSONS WHO COLLECT CHILD PORNOGRAPHY**

17.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that child pornography is

readily available on the Internet, from which it can easily be downloaded onto a personal computer, smart phone, or other device with Internet access in the form of digital video and image files.  Such digital files are easily saved or copied onto portable electronic data storage devices, such as external hard drives and smaller, more compact thumb and flash drives.  Such digital files are also easily copied or "burned" onto CDs and DVDs and transferred onto smart phones and other types of mobile telephones and personal computing devices, such as tablets.

18.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following information about the availability of child pornography on the internet and the practices of persons who distribute, possess, and collect child pornography images and videos:

a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.  Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, digital photographs, magazines, motion pictures, videotapes, digital videos, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials

14

for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse a selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals may also correspond with others with similar interests to share information and materials. In such cases, these persons rarely destroy correspondence from other child pornography distributors and possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

d. Such individuals frequently also collect and maintain materials evidencing a sexual interest in young children, such as fantasy writings and texts, emails, and chats with other people with similar interests.

e. Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, digital videos, magazines, negatives, photographs, digital photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, digital photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, videotapes and digital videos for many years.

15

f.   Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer, an external hard drive, or a flash or thumb drive.  Child pornography images stored in this way is often maintained for several years and kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.  Thus, even if a person suspected of possessing child pornography uses a portable device (such as a mobile phone) to access child pornography on the Internet, there is probable cause, based on my training and experience, to believe that either child pornography or evidence of accessing the Internet with intent to view child pornography will be found in his residence, as well as vehicles located at the person's residence.

g.   Some possessors of child pornography have been known repeatedly to download child pornography onto their computers, view it, and then delete it from their computers.  In such cases, evidence of this activity, including deleted child pornography image and video files, often can be located on such person's computers and digital devices using forensic tools.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

 23. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

  a. Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

  b. Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

18

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

     c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Kenneth Dye's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of Dye's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

26.  For all the reasons described above, there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be

//

//

found in a search of the person and premises further described
above and in Attachments A-1 through A-4 of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of May
2021.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE